**Paul A. BLACKBURN, Petitioner,**

v.

**Lynn MARTIN, etc., et al., Respondents.**

**No. 91–2385.**

United States Court of Appeals,
Fourth Circuit.

Argued June 1, 1992.

Decided Oct. 15, 1992.

Amended by Order Filed Dec. 11, 1992.

William Reynolds Williams, Willcox, McLeod, Buyck, Baker & Williams, P.A., Florence, SC, argued for petitioner.

Anne Payne Fugett, U.S. Dept. of Labor, Washington, DC, argued (Marshall J. Breger, Sol., Monica Gallagher, Associate Sol.,

and William J. Stone, Counsel for Appellate Litigation, U.S. Dept. of Labor, on brief), for respondents.

Before WILLIAMS, Circuit Judge, BUTZNER, Senior Circuit Judge, and GARBIS, United States District Judge for the District of Maryland, sitting by designation.

## OPINION

WILLIAMS, Circuit Judge:

Paul A. Blackburn seeks review under the Energy Reorganization Act of 1974 (ERA), 42 U.S.C. § 5851(c) (1988), of a final decision of the Secretary of Labor ·(the Secretary) relating to his wrongful termination from employment with Metric Constructors, Inc. (Metric). Specifically, Blackburn contends that there is not substantial evidence to support (1) the Secretary's determination of when Metric's back pay liability ended; (2) the Secretary's conclusion regarding the amount of overtime pay; and (3) the Secretary's denial of an award of compensatory damages. We conclude that substantial evidence supports the Secretary's decision on back pay and overtime, but not on the denial of compensatory damages. We remand to the Secretary for a determination of the appropriate amount of compensatory damages.

## I

Metric was an independent contractor hired to perform construction work for Carolina Power and Light Company (CP & L) at its H.P. Robinson Nuclear Plant in Hartsville, South Carolina. Metric hired Blackburn to perform electrical work on a project during an outage at the plant. Blackburn's pay rate for this assignment was $12.00 an hour.

Metric terminated Blackburn's employment on September 5, 1984, when he re-fused to work in the plant's reactor container area without protective lead shielding in place. In December 1984, CP & L terminated Metric from the electrical project on which Blackburn had been working and gave the work to another contractor. All forty-five Metric electricians remaining on the project received reduction in force notices.

Power Plant Maintenance (PPM) took over Metric's work on the electrical project at the H.P. Robinson Nuclear Plant. PPM hired Blackburn to work at the Robinson Plant in October 1984. According to Blackburn, PPM then found he could not work on the job because CP & L refused to issue him a security clearance. Instead, he worked for two weeks on a PPM project in Roxboro, North Carolina. Blackburn had several different electrical jobs from 1985 to 1987 and his gross earnings were comparable to his earnings while working for Metric. In January 1988, Blackburn became self-employed, thereby removing himself from the labor market for electricians.

In her initial decision, the Secretary determined that Blackburn was wrongfully terminated from his employment with Metric Constructors in violation of the employee protection provisions of the ERA. 42 U.S.C. § 5851(a) (1988).[1] After ordering Metric to reinstate Blackburn, the Secretary remanded the case to an Administrative Law Judge (ALJ) for a determination of back pay and/or compensatory damages and attorneys' fees.

Following an evidentiary hearing, the ALJ issued a recommended decision awarding Blackburn back pay for the period from September 6, 1984, the date of his discharge, through December 31, 1987, the date that Blackburn became self-employed. The ALJ also recommended awarding Blackburn $10,000 in compensatory damages for emotional distress and mental anguish, as well as employee expenses, such

1. Blackburn's complaint was initially processed by the Wage and Hour Division of the U.S. Department of Labor which concluded that his termination violated the ERA. *Blackburn v. Metric Constructors, Inc.,* 86–ERA–4, slip op. at 2–3, (Dep't Labor June 21, 1988) (Decision of the Secretary giving procedural history). Met-ric appealed this conclusion to an ALJ, who issued a recommended order dismissing Blackburn's complaint for failure to prove a retaliatory motive for his discharge. *Id.* at 4–5. The Secretary rejected the Administrative Law Judge's recommendation and found that the termination violated the ERA. *Id.* at 15.

as living expenses incurred while working out of town after he was fired, attorneys' fees, and costs.

Both Blackburn and Metric filed exceptions to the ALJ's recommendation. After reviewing the exceptions, the Secretary issued her final decision. In that decision, the Secretary reduced the ALJ's determination of Blackburn's back pay, limiting it to the period from September 6, 1984, through December 31, 1984, the date CP & L terminated Metric's contract. The Secretary also modified the ALJ's determination of the amount of overtime Blackburn would have received had he not been terminated. Finally, the Secretary rejected the ALJ's recommended compensatory damages award. Blackburn appeals.[2]

## II.

Among the factors we address in reviewing a decision of the Secretary of Labor are whether it is supported by "substantial evidence", 5 U.S.C. § 706(2)(E) (1988), and whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). *See* ERA, 42 U.S.C. § 5851(c)(1) (referencing Chapter 7 of Title 5). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

■ In conducting our review, we consider the entire record before us, including the ALJ's recommendation and any evidence that is contrary to the Secretary's determination. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). It is not our role to determine the weight of the evidence or to substitute our judgment for that of the Secretary if her decision is supported by substantial evidence. *Cf. Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir.1990)

(discussing the standard of review for a decision of the Secretary of Health and Human Services).

In this case, the Secretary's decision departs from the ALJ's recommendation. Blackburn contends that this divergence requires us to examine the evidence more critically in determining whether there is substantial evidence to support the Secretary's decision. *Syncro Corp. v. NLRB*, 597 F.2d 922, 924–25 (5th Cir.1979). Blackburn's contention is correct, but only where disagreements between the Secretary and the ALJ involve questions of fact and credibility.

As the Supreme Court stated in *Universal Camera:*

The "substantial evidence" standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of the testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case.

340 U.S. at 496, 71 S.Ct. at 469. The issues presented for appeal in this case require us to consider overlooked evidence and the correct application of legal principles rather than resolve differing credibility determinations or findings of fact. Because the issues in this appeal do not turn on credibility, we apply the basic substantial evidence standard without any "special scrutiny." *NLRB v. Frigid Storage, Inc.*, 934 F.2d 506, 509 (4th Cir.1991); *see also NLRB v. Stor–Rite Metal Prods., Inc.*, 856 F.2d 957, 964 (7th Cir.1988).

Applying this standard of review, we will address each of Blackburn's contentions

---

**2.** Blackburn does not seek review of the portions of the Secretary's decision addressing employee expenses, attorneys' fees, and costs.

and will determine whether there is substantial evidence to support the Secretary's decision with regard to (1) the time period for the back pay award; (2) the amount of overtime; and (3) the rejection of a compensatory damages award.

## A

In her decision, the Secretary rejected the ALJ's recommendation that Blackburn be awarded back pay from the date of his discharge until the date he removed himself from the labor market by becoming self-employed. The Secretary concluded that Blackburn's entitlement to back pay ended on December 31, 1984, the date on which CP & L fired Metric from the electrical project for which Blackburn had been hired.

■ In reaching this conclusion, the Secretary relied on the legal principle, well-established in other employment discrimination contexts, that the goal of back pay is to make the victim of discrimination whole and restore him to the position that he would have occupied in the absence of the unlawful discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) (quoting 118 Cong.Rec. 7168 (1972) (remarks introduced by Sen. Williams regarding remedial purposes of Title VII)); *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir.1985). Therefore, the person discriminated against should only recover damages for the period of time he would have worked but for wrongful termination; he should not recover damages for the time after which his employment would have ended for a nondiscriminatory reason. *Martinez v. El Paso County*, 710 F.2d 1102, 1106 (5th Cir.1983). For example, if a position were abolished for financial reasons, the employee would not be able to recover after the position was eliminated. *Edwards v. School Bd.*, 658 F.2d 951, 956 (4th Cir.1981). Similarly, back pay liability ends when the contract under which the employee worked is terminated. *Holley v. Northrop Worldwide Aircraft Servs., Inc.*, 835 F.2d 1375, 1377 (11th Cir.1988).

■ Blackburn first contends that his back pay should not expire December 31, 1984, because Metric continued to employ electricians at the H.P. Robinson plant after the end of 1984. While this may be the case, the key issue remains whether Blackburn, who was hired to work on a particular electrical project, would have continued to work for Metric after December 1984 had he not been terminated. Metric presented uncontroverted evidence that the project for which Blackburn was hired ended in December 1984. A Metric personnel officer, David LaBounty, testified that all forty-five of the other electricians still working on the outage after Blackburn was terminated received reduction in force notices in December 1984. Absent evidence that Blackburn's employment with Metric on the outage project would have continued past December 31, 1984, Metric's back pay liability should cease on that date.

Blackburn's second basis for contending that December 1984 is not the appropriate date to end Metric's back pay liability is that Metric would have employed him at another site had he not been wrongfully terminated. Ample evidence indicates Metric would not have retained Blackburn beyond the end of the project. Even though two of the forty-five remaining electricians went to work for Metric on another project in Florida, they were not transferred there by Metric but went through the normal application and hiring process. LaBounty testified that Metric did not have a policy of transferring employees to other sites once a project was completed and did not give any preference to former employees in rehiring at other projects. Indeed, Metric's policy as described by LaBounty was to give preference to local applicants who would not need to travel long distances to work or live away from home. Although Blackburn testified that he expected to be hired by Metric on another project because other employers usually gave preference to former employees, his testimony was merely speculative and insufficient to support the extension of back pay liability beyond December 1984. *See Holley*, 835 F.2d at 1377. Blackburn's expectations do not negate the clear evidence regarding Metric's

actual practices. The Secretary properly relied on the evidence of Metric's actual practices in making her decision.

■ Blackburn's third ground for disagreeing with the Secretary's decision ending back pay on December 31, 1984, is that Metric interfered with his ability to obtain other employment by blacklisting him. In support of this contention, Blackburn relies on the fact that he was denied the position with PPM at the H.P. Robinson Nuclear Plant because he could not obtain a security clearance from CP & L.

The Secretary found that Blackburn failed to establish a critical link in proof, namely that it was *Metric* which had blacklisted him. Blackburn did not put forward any persuasive evidence that Metric *caused* CP & L to refuse Blackburn's security clearance.[3] Blackburn argues that the Secretary was simply "nitpicking."[4] (Petitioner's Br. at 14.) On the contrary, evidence establishing causation is critical if we are to hold Metric liable for the security determinations of CP & L. *See Holley*, 835 F.2d at 1377 ("plaintiff presented nothing more than circumstantial and inconclusive evidence to support the proposition that the employment decisions made by the new company were influenced by the prior employer"); *see also Austin v. Torrington Co.*, 810 F.2d 416, 421 (4th Cir.) (discussing

the tort of blacklisting under South Carolina law and holding that such a tort would require showing "a combination of employers who exchanged the information contained on the blacklist"), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987).

Although we find CP & L's denial of Blackburn's security clearance disturbing, substantial evidence supports the Secretary's conclusion that Blackburn failed to meet his burden of proving that Metric caused his blacklisting. Therefore, the legally appropriate date for ending Metric's back pay liability is December 31, 1984. We affirm the Secretary's decision on the back pay issue, finding it in accordance with the law and supported by substantial evidence.

**B**

■ Consistent with the objective of making Blackburn whole, he is also entitled to compensation for any overtime hours he would have worked for Metric. At the hearing before the ALJ, Blackburn called an economist as an expert witness. The economist annualized Blackburn's estimate of the overtime hours he had worked for Metric, and calculated how many overtime hours he would have earned had he continued employment with Metric.[5] The ALJ

---

3. Blackburn argues that we should impute CP & L's actions in denying him security clearance to Metric. Blackburn's evidence indicated that as a subcontractor for CP & L, Metric was required to: (1) follow all of CP & L's rules, regulations and procedures; (2) require its employees to undergo a CP & L security check; and (3) follow the CP & L employment manual. These facts may be true but they are simply not sufficient as a matter of law to establish that CP & L and Metric were one and the same for purposes of determining Metric's back pay liability.

4. Though Blackburn stresses the fact that the Secretary did not have the opportunity to observe Blackburn's demeanor, we do not believe such observation was necessary to conclude that responses such as the following were vague and evasive:

> Q. Okay. But the reason that Power Plant Maintenance Company did not employ you was because of CP & L not issuing you the passes, I think you said. Is that correct?
> A. Yes, sir. Which in turn was by Metric.

Q. That's your speculation though. You don't know that. Is that correct?
A. Well, it speaks for itself.

(J.A. at 61.) We also do not agree with Blackburn's assertion that by concluding that the burden of proof was not met, the Secretary is necessarily rejecting the credibility determinations of the ALJ.

5. At the 1985 hearing, Blackburn testified that beginning in July he was working 60 to 70 hours per week (20 to 30 hours of overtime per week). (Respondent's Br. at 26 n. 15.) At the hearing in 1988, he testified that after July he worked 84 hours per week (44 hours of overtime per week). (J.A. at 46.) In describing his calculation of the overtime component of Blackburn's back pay, the economist testified:

> The only information I have on Metric overtime [sic] has to do with the year 1984, and I estimated that, in his employment from March 28th through September 5th, that he earned over-time [sic] of $6,459.29, $6,429.29, and that estimate was based on the following information: That in the quarter March 28 to

recommended awarding Blackburn overtime pay based on the testimony of the economist.

The ALJ acknowledged that Metric was in the best position to supply information on the actual amount of overtime available at the H.P. Robinson Plant for the remainder of 1984 and on how such overtime should be computed. The ALJ accepted Blackburn's proffered calculation of the overtime rate for 1984, however, because he found an absence of any countervailing information from Metric.

As the Secretary pointed out, Metric did offer evidence regarding the actual amount of overtime that would have been available to Blackburn had he not been terminated. Blackburn's overtime was sporadic during the first several months of his employment; it then increased significantly in the period prior to his discharge. According to LaBounty, the amount of overtime hours Blackburn worked during his six-month employment was unusually high. Metric's overtime work decreased substantially after Blackburn's September termination. LaBounty testified that Blackburn's high number of overtime hours in July occurred because of a shortage of electricians and because Metric was trying to meet a deadline. LaBounty calculated the most overtime that any electrician on the project made for each remaining week in the year. He then totalled the amount for each week and determined that the maximum overtime a Metric electrician at the H.P. Robinson Plant could have received for the remainder of 1984 was 160 hours.

The Secretary rejected the expert witness's overtime figure, which was an estimate based on an estimate, and relied instead on LaBounty's testimony. Blackburn contends that in so doing the Secretary improperly rejected the credibility determinations of the ALJ, who was in the best position to evaluate the witnesses. It appears from the ALJ's recommended decision that, rather than finding LaBounty's

testimony not credible, the ALJ completely ignored it. Blackburn argues that the ALJ's failure to discuss the testimony of the expert witness is an implicit finding that the testimony was not credible. A failure to recognize evidence is not an implicit credibility determination. *Cf. King v. Califano,* 615 F.2d 1018, 1020 (4th Cir. 1980) (relevant evidence should not be discounted or rejected without an explanation of the reason).

Rather than rely on the economist's speculative estimates, the Secretary relied on evidence of the maximum amount of overtime Blackburn would have worked had he not been terminated. We find that the Secretary properly reduced the recommended overtime amount to reflect the more accurate evidence. Because substantial evidence supports the Secretary's decision, we affirm her determination of the amount of overtime pay.

C

▮▮▮▮ The employee protection portions of the ERA provide that the Secretary may order violators to pay compensatory damages to the victims of their discriminatory acts. 42 U.S.C. § 5851(b)(2)(B)(ii); *see also DeFord v. Secretary of Labor,* 700 F.2d 281, 288 (6th Cir.1983); 29 C.F.R. § 24.-6(b)(2) (1992). In order to recover compensatory damages, Blackburn needed to show that he experienced mental and emotional distress and that the wrongful discharge caused the mental and emotional distress. *Carey v. Piphus,* 435 U.S. 247, 263–64 & n. 20, 98 S.Ct. 1042, 1052 & n. 20, 55 L.Ed.2d 252 (1978).

The ALJ recommended that Blackburn be awarded $10,000 in compensatory damages for the emotional distress and mental anguish arising from his unlawful termination. As the ALJ stated in his recommended decision:

> The firing by Metric lowered Mr. Blackburn's self esteem. He became depressed and had difficulty sleeping. The

June 30, 1984, there was assumed to be no over-time [sic]. With that as a benchmark, I then forced out what I think was the over-time [sic] for the year of [$]6,459.29. If the

$6,459.29 is annualized, that produces an annualized estimated over-time [sic] of $14,680. (J.A. at 83.)

stress of the termination disrupted his family, caused quarrels at home and adversely affected his relationship with his wife and children.

(J.A. at 175 (citations to the transcript omitted)).

The Secretary's decision characterizes Blackburn's compensatory damages claim as an assertion that "his family problems and his loss of self esteem resulted from his diminished financial situation brought about because of his inability to find a job following his termination from Metric." (J.A. at 197.) In reviewing the record for evidence that Blackburn actually suffered a financial loss, the Secretary found little support. We agree with this portion of the Secretary's decision. Indeed, the record indicates that in the three years after Blackburn's termination, his earnings were comparable to his straight time earnings while at Metric and to his earnings for the three years prior to his employment with Metric. In light of the paucity of evidence showing that Blackburn's financial situation worsened, the Secretary rejected the ALJ's recommendation and concluded that an award of compensatory damages for emotional distress and mental anguish was inappropriate.

The Secretary's conclusion that Blackburn's financial situation did not worsen should not have ended the inquiry into the appropriateness of compensatory damages. The ERA provides for the award of compensatory damages *in addition to* remedies designed to restore any financial losses that the victim of discrimination suffered. 42 U.S.C. § 5851(b)(2)(B)(ii); *see Deford*, 700 F.2d at 288 ("Section 5851(b)(2)(B) discloses that 'compensatory damages' are allowable *in addition to* abatement of discrimination, reinstatement with back pay, and restoration of all job-related entitle-

ments such as retirement benefits."). As the ALJ pointed out, compensatory damages are appropriate in wrongful discharge cases for "intangible damages such as mental anguish when the economic impact cannot be quantified." (J.A. at 177 (citing *Smith v. Atlas Off-Shore Boat Serv., Inc.*, 653 F.2d 1057, 1064 (5th Cir.1981); *DeFord v. Tennessee Valley Auth.*, Secretary's Order on Remand, 81–ERA–1 (1984) (slip op[.] ); *Hedden v. Conam Inspection*, 82–ERA–3 (ALJ decision) (slip op[.] )).)

In support of his claim for compensatory damages, Blackburn, his wife, and his father testified about Blackburn's emotional state after the wrongful termination. Each of these witnesses testified about Blackburn's financial problems. At least a portion of each of their testimony, however, attributed his loss of self esteem and emotional problems to the fact that he was fired, apart from any financial consequences of the termination.[6]

The Secretary does not acknowledge any basis for Blackburn's claim other than his diminished financial situation. Although Blackburn's proof might not be as clearly delineated as we would like, the record includes substantial evidence that the emotional distress Blackburn experienced was due, at least in part, to the fact of the wrongful discharge itself. Blackburn argues that the Secretary should not have rejected the ALJ's determination that the testimony about Blackburn's emotional distress was credible. In our view, the Secretary did not explicitly reject the ALJ's credibility determinations but improperly overlooked the emotional impact of the firing itself.

We do not believe the record supports the Secretary's narrow view of Blackburn's position. The Secretary's decision should

---

**6.** For example, Blackburn himself testified:
  Well, emotionally, you know, you're on a high when everything is going good, but when you get fired—I've never been fired on a job, and that's just like saying a person is no good, in my opinion.
  (J.A. at 50.)
His wife testified:
  Well the whole deal had a lot to do with it. The firing thing. Well, just the stress of the

whole thing that we've been through with this. The stress.
  (J.A. at 97.)
Blackburn's father testified:
  He was just about as low as you can ever get. And there's a lot of difference in being terminated and being fired. There's a lot of difference in that. . . . It's a terrible feeling.
  (J.A. at 105.)

be set aside when a fair estimate of the witnesses' testimony does not justify the decision. *Universal Camera*, 340 U.S. at 490, 71 S.Ct. at 466. In this case, a fair estimate of the testimony offered by Blackburn does not warrant a denial of any compensatory damages. Indeed, there is substantial evidence to support an award of compensatory damages. Because the Secretary denied Blackburn any award of compensatory damages, she had no occasion to assess whether the amount recommended by the ALJ was appropriate. Therefore, we remand the case to the Secretary for a determination of the appropriate amount of compensatory damages.

### III.

For the foregoing reasons, we affirm the Secretary of Labor's decision and order, we reverse the denial of compensatory damages, and we remand to the Secretary for determination of the proper amount of compensatory damages.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.