M.A. BRYANT, et al., Plaintiffs,

v.

SECRETARY, U.S. DEPARTMENT OF AGRICULTURE, Defendant.

No. CIV. A. 97–0023–A.

United States District Court,
W.D. Virginia,
Abingdon Division.

Oct. 13, 1998.

---

Robert T. Copeland, Copeland, Molinary & Bieger, Abingdon, VA, for Plaintiffs.

Julie C. Dudley, U.S. Attorney's Office, Roanoke, VA, for Defendant.

## OPINION

JONES, District Judge.

The question in this case is whether the Farm Service Agency's decision not to service the plaintiffs' farm loan was supported by substantial evidence and whether the hearing officer committed legal errors requiring a remand for further consideration. I find that the decision was supported by substantial evidence and that no remand is necessary. Accordingly, I affirm the agency's decision under the Administrative Procedures Act.

### I

The plaintiffs, M.A. and Vivian Bryant, husband and wife, are operators of a dairy farm in Smyth County, Virginia. They filed this action pursuant to the Administrative Procedures Act,[1] alleging that they were aggrieved by an administrative decision of the Farm Service Agency, the successor to the Farmers Home Administration,[2] by which they were denied further servicing of their existing farm loan on the ground that they had not acted in good faith by disposing of the collateral for the loan. The Bryants claimed that the agency denied them due process of law in arriving at the decision, and that the decision was not based on substantial evidence. In particular, they claimed that the agency's hearing officer refused to allow them to subpoena witnesses, refused to hear relevant evidence, and acted as no more than a "rubber stamp" for the agency.[3]

The defendant answered and filed the administrative appeal record.[4] Cross motions for summary judgment based on that record

have been filed and the parties have briefed and orally argued the issues. The case is thus ripe for decision.

### II

As stated by their counsel, Mr. and Mrs. Bryant have a "long history" with the agency.[5] The current controversy began on April 10, 1985, when they obtained a farm loan from the predecessor agency, Farmers Home Administration ("FmHA"). They granted the agency a security interest in all crops, farm equipment and livestock then owned or thereafter acquired by them to secure the due payment of the loan. The security agreement required them to obtain the prior written consent of FmHA before removing or disposing of the collateral.[6]

In 1987 the Bryants filed a petition seeking reorganization under Chapter 11 of the Bankruptcy Code. FmHA was the only secured party, and the bankruptcy court approved an amended plan of reorganization by which $120,000 of the debt owing to FmHA was refinanced "with the creditor maintaining a first deed of trust on the farm property and equipment, cattle and all replacements."[7] The balance of the debt of $72,000 was declared unsecured.

The original security agreement identified seventy-eight cows, heifers and calves then owned by the Bryants. An annual "chattel inspection" was made by a FmHA employee in 1988, and the report of that inspector noted that there were 114 head of cattle on the farm.

On February 28, 1989, another inspection was made and revealed only eighty-two cattle. Records obtained by FmHA showed that following the date of the 1988 inspection, the Bryants had sold thirty-one cows at local livestock markets, but had not obtained the prior consent of FmHA and had kept the

---

1. 5 U.S.C.A. §§ 702–706 (West 1996) ("APA").

2. *See* Department of Agriculture Reorganization Act of 1994, § 226(b)(3), Pub.L. 103–354, 108 Stat. 3209, 3214 (1994).

3. Compl., Feb. 13, 1997, at ¶ VI.

4. Referred to hereafter as "AR." The transcript of the January 17, 1996, administrative hearing is referred to as "Tr."

5. Mem. in Supp. of Cross Mot. for Summ. J. at 1.

6. AR at 33, 34.

7. AR at 36.

proceeds of the sales of approximately $12,-000. Mr. Bryant told the inspector that the cattle sold had been purchased by him in 1983 and 1985 from two other dairy farmers, Ike Fleenor and Danny Umbarger.[8]

Because of these circumstances, the Office of the Inspector General of the Department of Agriculture conducted an investigation and recommended a prosecution of the Bryants for disposing of the collateral, but the United States attorney for this district declined the case. The Bryants then sued the agency under the antidiscrimination provisions of the Bankruptcy Code, claiming that FmHA had improperly investigated them and denied them a new loan. Summary judgment was granted for the agency and the Fourth Circuit affirmed.[9]

In March of 1994, the agency again inspected the farm and found no cattle; the Bryants had apparently terminated their operation. At about the same time, FmHA received an adverse credit report on the Bryants, including three outstanding judgments.[10] By letter of March 22, 1994, FmHA demanded that within thirty days the Bryants either pay FmHA for the missing cattle, which had an appraised value of $42,-900, or replace them.[11] The Bryants did not comply.

In the meantime, the Bryants had applied for a new FmHA loan and in May of 1994, the local county committee denied their application on the basis of their poor credit history and the conversion of the collateral. The Bryants appealed the denial to the National Appeals Division of the Department of Agriculture, which affirmed by opinion of December 12, 1994. The opinion stated that the affirmance was in part because, "[t]he

record and testimony indicate that the appellants did not obtain the approval of FmHA to liquidate the dairy livestock with or without any financial consideration." [12]

It appears that no judicial review was sought of the agency's denial of a new loan. However, the Bryants applied for a "loan servicing" of their existing farm loan. Congress has authorized the agency to assist farmers in financial difficulty by "debt restructuring and loan servicing." [13] The objectives of the program are to "ensure that borrowers are able to continue farming" and to avoid or minimize losses to the government.[14] The tools available to the agency for "servicing" include loan restructuring, payment deferral and debt write-down. Pursuant to the regulations, applicants for loan servicing must meet certain criteria, including having acted in "good faith" by demonstrating "honesty" and "sincerity" in complying with written agreements with the agency.[15]

The local loan program manager for the agency advised the Bryants by letter of October 30, 1995, that their request for loan servicing had been denied, in part because of their disposal of the collateral, which evidenced a lack of good faith.[16] The Bryants exercised their right of administrative appeal, and a hearing was held before a Department of Agriculture hearing officer on January 17, 1996, at which the Bryants testified and were represented by present counsel.

At the hearing, the agency withdrew any ground for the denial of loan servicing other than the alleged lack of good faith.[17] Following the hearing, the hearing officer issued a written opinion on February 13, 1996, up-

---

**8.** AR at 56.

**9.** *Bryant v. United States,* No. 91–145–A (W.D.Va.) (Turk, J.), *aff'd,* No. 96–1161, 1997 WL 633256 (4th Cir. Oct. 14, 1997) (unpublished).

**10.** AR at 50.

**11.** AR at 44.

**12.** AR at 52–53.

**13.** *See* 7 U.S.C.A. §§ 2001–2006 (West 1988 & Supp.1998).

**14.** *Id.* § 2001(a).

**15.** 7 C.F.R. § 1951.906 (1998). The distressed loan procedures are set forth in part 1951, subpart S, of title 7 of the Code of Federal Regulations, and are thus known as "1951–S servicing." *See Chamblee v. Espy,* 100 F.3d 15, 16 (4th Cir. 1996).

**16.** AR at 139.

**17.** Tr. at 5–7.

holding the agency decision.[18] The Bryants sought further administrative review from the director of the National Appeals Division, which upheld the hearing officer's decision by written opinion dated April 30, 1996.[19] Thereafter, the present suit was filed.

### III

■ I review an administrative decision under the APA for whether it is supported by substantial evidence and whether it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.[20] Substantial evidence consists of such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[21] I review questions of law de novo.[22]

■ The principal[23] argument by the plaintiffs involves the livestock purchased by the Bryants from Fleenor and Umbarger in 1983. It is asserted by them that the purchase money liens held by Fleenor and Umbarger were avoided by the confirmation of the Bryants' 1987 Chapter 11 plan, which recognized FmHA as the only secured creditor. As debtors in possession, they contend, they obtained the benefit of the avoided liens under section 551 of the Bankruptcy Code[24] and were thus free to dispose of these cattle in 1988 without obligation to FmHA. The Bryants' counsel succinctly summarized this argument to the hearing officer as follows:

> [I]n the bankruptcy, we avoided the security interest ... and recovered these cattle for the estate, therefore, they were not covered by the Farmers Home security interest, therefore, we did not convert them, therefore, we're not in violation of [the] regulation.[25]

■ There is no doubt that any liens held by Fleenor and Umbarger were not perfected by recording, and thus the "strong arm" powers contained in section 544 of the Bankruptcy Code[26] cut off any such unperfected security interests. Moreover, section 551 does, by its terms, preserve for the benefit of the estate any liens avoided by operation of section 544. However, the estate succeeds only to the priority of the avoided lien insofar as competing liens are concerned. As a noted commentator has stated:

> Defects in the lien under state law, such as failure properly to perfect (or to continue perfection of) a personal property security interest or properly to record a real property lien, are not cured. Avoidance and preservation of the lien do not remove the defect or enhance the avoided lien's priority under state law in comparison to competing liens on the same property.

> Thus, when a trustee avoids a prepetition security interest because the secured party has failed properly to perfect or record its lien, the avoided lien held by the estate is subject to the same state law defect and is likely subordinate to liens properly perfected or recorded prepetition.[27]

Accordingly, in the present case, the lien of FmHA, which was duly perfected, and expressly covered all livestock owned by the Bryants, had priority over any unperfected

---

**18.** AR at 4–7.

**19.** AR at 1–3.

**20.** *See* 5 U.S.C.A. § 706; *Blackburn v. Martin,* 982 F.2d 125, 128 (4th Cir.1992); *Leitman v. McAusland,* 934 F.2d 46, 48 (4th Cir.1991) (setting forth the standard of review of administrative agency decisions under the APA).

**21.** *Blackburn,* 982 F.2d at 128; *Leitman,* 934 F.2d at 51.

**22.** *See Bechtel Constr. Co. v. Secretary of Labor,* 50 F.3d 926, 931 (11th Cir.1995).

**23.** At the administrative hearing, the Bryants' counsel referred to this argument as "crucial" to their case. Tr. at 13. In oral argument in this court, he called it the "central issue."

**24.** 11 U.S.C.A. § 551 (West 1993).

**25.** Tr. at 89.

**26.** 11 U.S.C.A. § 544(a)(1) (West 1993). The bankruptcy trustee is deemed to have the powers of avoidance of a hypothetical judicial lien creditor on all property of the debtor as of the time of commencement of the case. *Id.* A debtor in possession also may exercise these powers. *See Little v. Duncombe (In re Duncombe),* 143 B.R. 243, 245 (Bankr.C.D.Cal.1992).

**27.** 5 *Collier on Bankruptcy* ¶ 551.02 (Lawrence P. King et al. eds., 15th ed.1998). *See In re DeLancey,* 94 B.R. 311, 313 (Bankr.S.D.N.Y.1988).

liens held by Fleenor and Umbarger and preserved for the estate.

An argument made before the hearing officer, but not in this court, was that FmHA had knowledge of the prior purchase money liens, and thus those liens, even if not perfected, were superior to that of FmHA. The only evidence of this, however, was Mr. Bryant's testimony that he told a FmHA representative in 1985 that certain cattle had been provided to him by Umbarger and Fleenor and that the FmHA had known that Bryant had assigned a portion of his receipts from the sale of milk to Fleenor.[28] However, neither that testimony nor the actual milk assignments give any indication that either Fleenor or Umbarger had a security interest in the cattle themselves.

In any event, under the "first in time, first in right" filing theory of the Virginia Uniform Commercial Code, knowledge is not generally relevant in determining priority of liens.[29]

Moreover, the only evidence of a purchase money security interest was in relation to the twenty cattle sold to Mr. Bryant by Ike Fleenor. There is no evidence of a written security agreement in the cows purchased from Umbarger, and Virginia law requires that an enforceable security interest be evidenced by a writing signed by the debtor which describes the collateral.[30]

Finally, the Bryants' argument is only relevant to justify the results of the 1989 inspection. It would not explain the absence of any cattle on the Bryants' farm in 1994.

For these reasons, the main argument advanced by the plaintiffs as to their good faith in disposing of the agency's collateral is without merit.

The plaintiffs also contend that the fact that they testified that they replaced the cattle herd on their farm in 1995, the year following the notice to them from the agency to do so, is conclusive evidence that they acted in good faith. The question of the

Bryants' lack of good faith in disposing of the livestock in the past, however, is separate from whether the agency now has collateral for its loan. Indeed, according to their attorney in oral argument, the Bryants contend that the agency has no lien on their present cattle herd. Even if it did, however, the issue of good faith cannot depend entirely on whether the agency now has security for the farm loan. The agency has a rightful interest in aggressively insuring that the beneficiaries of its programs and of its scarce resources are those who have records of forthrightness and honesty, regardless of the ability of the agency to collect on their past loans.

For these reasons, it is clear that the agency's decision was based on substantial evidence.

## IV

The Bryants additionally contend that the agency's decision was arbitrary because the hearing officer acted as a "rubber stamp" for the agency by virtue of his ruling that he had no power to overrule the legal opinion of the Office of the General Counsel of the Department of Agriculture as to the Bryants' lack of good faith. However, for the reasons hereafter stated, I find that the hearing officer acted appropriately.

The applicable regulations require that before the agency denies loan servicing to an applicant because of lack of good faith based on fraud, waste, or conversion, a written legal opinion from the Office of the General Counsel must be obtained to "substantiate" such allegations.[31] This provision obviously serves as an additional safeguard to possible arbitrary action by agency officials. In this case, the agency obtained such an opinion, dated July 11, 1995, to the effect that the conversion of cattle by the Bryants "clearly violates the terms of [the] security agreement(s) [sic], which in pertinent part, demand that debtors seek [the agency's] writ-

---

28. Tr. at 42–43; AR at 164, 165.

29. *See* Va.Code Ann. § 8.9–312(5)(a) (Michie Supp.1998); *Grossmann v. Saunders,* 237 Va. 113, 376 S.E.2d 66, 72 (1989).

30. *See* Va.Code Ann. § 8.9–203(1)(a) (Michie Supp.1998).

31. 7 C.F.R. § 1951.906 (1998).

ten approval prior to transferring collateral, namely cattle."[32]

 The hearing officer ruled that he did not have the power to overrule the legal conclusion of the Office of General Counsel, but he could determine whether the facts on which that conclusion was based were erroneous.[33] Accordingly, the Bryants were given an opportunity to contest the facts on which the agency action was based, which was the primary purpose of the administrative hearing.[34] Of course, the main defense by the Bryants, then as now, is not a factual one, but a legal argument; namely, that the effect of their bankruptcy proceeding was to give them clear title to the cattle which they admittedly sold. I have already decided that question against them, as set forth previously in this opinion, and thus the hearing officer's refusal to decide it did not prejudice the Bryants.

The Bryants also complain of the hearing officer's refusal to subpoena certain witnesses and his exclusion of other evidence. It is clear, however, that the excluded witnesses and evidence complained of, with one exception, relate to the legal argument which is central to the Bryants' case.[35] That argument is unavailing and the hearing officer's procedural decisions are thus not the basis of reversible error.

 The hearing officer also excluded a three-page document from the agency's records containing a history of the Bryants' numerous loans from the agency. The list showed that a portion of the April 10, 1985, loan had been "declared" unsecured by the bankruptcy court.[36] The hearing officer excluded this document as irrelevant, which it is. There is no question but that the confirmed Chapter 11 plan declared a portion of the 1985 FmHA loan unsecured, but that does not affect the validity of the bulk of the loan, which remains secured.

32. AR at 59.

33. Tr. at 28.

34. The statute establishing administrative review of the agency decision here provides that the hearing officer will hold an "evidentiary hearing" and "shall not be bound by previous findings of fact by the agency in making a determina-

## V

For the foregoing reasons, the defendant's motion for summary judgment must be granted.

A final judgment will be entered this day.

tion." 7 U.S.C.A. § 6997(c)(2) (West Supp. 1998).

35. *See* Mem. in Supp. of Cross Mot. for Summ. J. at 14, 18–19.

36. AR at 172. The excluded exhibits are part of the record.